Charles JOHNSON, County Judge *v.* SUNRAY
SERVICES, INC.

90-329                                    816 S.W.2d 582

Supreme Court of Arkansas
Opinion delivered September 23, 1991

498

*George E. Butler, Jr.*, Washington County Attorney, for appellant Washington County.

*James G. Lingle, P.A.*, by: *George D. Oleson*, for appellants.

*Robert B Leflar*, amicus curiae, for Ozark Headwaters Group of the Sierra Club.

*The Niblock Law Firm*, by: *Walter R. Niblock*, amicus curiae, for Beaver Water District.

*Davis Cox, & Wright* by: *Wm. Jackson Butt, II* and *Tim E. Howell*, for appellees.

ROBERT L. BROWN, Justice. This appeal comes to us from a decree by the chancery judge voiding a Washington County quorum court ordinance to regulate solid waste disposal facilities ("landfills") on constitutional grounds. The appellants are Washington County, members of the quorum court and other Washington County officials. The appellee is Sunray Services, Inc. ("Sunray"), a corporation that provides solid waste disposal services and that had applied to the quorum court for site approval to provide such landfill services at Durham in Washington County. The effect of voiding the quorum court ordinance was to allow Sunray to proceed with plans to construct the landfill.

The appellants raise several issues on appeal, but we reverse on the issue of whether the ordinance was rationally related to a legitimate government purpose. We hold that it was. We further

decline to affirm on the basis of the various issues raised by Sunray as additional arguments in support of the chancellor's decree.

The facts in this case are largely without dispute, although the findings and conclusions that can be gleaned from them are the subject of intense controversy. On June 30, 1989, Miller Matthews, chairman of the board and sole shareholder of Sunray, acquired 1,850 acres in the Durham area and immediately granted Sunray an option to purchase that land. On July 14, 1989, Sunray requested site approval for a landfill in a letter to the quorum court. The quorum court referred the request to its Environmental Affairs Committee ("EAC"). Under the rules of the Arkansas Department of Pollution Control and Ecology ("Pollution Control") the request had to be acted on within sixty days, or the request would be deemed approved.

Over the next sixty days the EAC had two meetings in which Sunray's request was discussed — July 25, 1989, and August 21, 1989. At the first meeting EAC heard comments from citizens opposed generally to landfills and from a geologist opposed to the specific site. Sunray consultants also discussed the proposed Durham site before the committee. At the close of the meeting, the committee recommended a moratorium on any new landfills in the county until a regional study could be completed.

The quorum court considered landfill limits in general and the Durham site in particular at its August 10, 1989 meeting. Public comment was received regarding buffer zones from main water supplies and a landfill moratorium. Sunray's counsel spoke in favor of the Durham proposal. The meeting ended with the quorum court's sending the moratorium issue back to EAC for additional consideration.

On August 21, 1989, EAC considered and heard comments on the Durham proposal, Sunray's past record, buffer zones for landfills in general, and pending Environmental Protection Agency regulations. Sunray's attorney also answered questions about the project and spoke in favor of it. The committee concluded the meeting by recommending that the quorum court adopt more restrictive landfill standards than Pollution Control had done.

The quorum court met again on September 14, 1989. At a prolonged meeting a general restriction ordinance was discussed as well as Sunray's site proposal. Citizen comments were received both in favor of a restrictive ordinance and opposed. Richard Starr, the Beaver Water District director, and Dr. Richard Meyer, a limnologist, spoke in favor of some buffer zone between landfills and main water sources. Sunray's counsel made a presentation in favor of the site proposal. By a vote of 11 to 2 the quorum court passed Ordinance No. 89-23, which established a two-mile buffer zone between landfills and main water sources. That ordinance reads in pertinent part:

> ARTICLE 1. No hazardous or other solid waste disposal facility as defined by Arkansas law shall be located within two (2) miles of the main water sources within Washington County, specifically Beaver Lake, Illinois River, Middle, Main and West Forks of the White River, Lee Creek, Prairie Grove Lake, Lincoln Lake, Clear Creek, Spring Creek, Fall Creek, Richland Creek, Barron Fork, Fly Creek, Wedington Creek, Cove Creek, Muddy Fork, Ballard Creek, Evansville Creek and Cincinnati Creek, and any other main water source so designated by the Quorum Court.

The ordinance included civil remedies for violations and an emergency clause making it effective immediately. The quorum court then heard from two Sunray consultants on the issue of the landfill request at Durham. The Sunray consultants did not discuss the effectiveness of a buffer zone to protect main water sources. Armed with the ordinance, the quorum court promptly denied Sunray's Durham site request on the basis that the site fell within two miles of the Middle Fork of the White River — a main water source listed in the ordinance and a Beaver Lake tributary.

Sunray appealed the quorum court's decision to Pollution Control on October 6, 1989, by filing a preapplication for a landfill with that department and requesting the Director of Pollution Control to review the quorum court's actions. The director did conduct a review, and on December 27, 1989, he overruled the quorum court's denial and authorized Sunray to continue with the preapplication process for site approval. Before Pollution Control could make its site evaluation, the state

Attorney General issued an opinion on February 27, 1990, which caused the director of Pollution Control to halt all further activity relative to the Durham site until the issue of the ordinance's validity and the denial of Sunray's request by the quorum court could be finally decided.

Sunray filed suit on March 2, 1990, to have the ordinance declared unconstitutional and invalid, and Washington County counterclaimed to enjoin Sunray from violating the ordinance. Trial was held before the chancellor on May 29-30, 1990. Sunray's testimony consisted of evidentiary depositions of quorum court members and live testimony of a Pollution Control hydrogeologist (Mark Witherspoon), an engineer employed by SCS Engineers of Covington, Kentucky (Jim Walsh), a second hydrogeologist (Dr. William White, a professor at Pennsylvania State University), and its owner (Miller Matthews). Washington County offered the testimony of quorum court member and EAC Chair Lois Imhoff, and that of Beaver Water District director Richard Starr.

The decree of the chancery judge was entered on August 3, 1990. It struck down the ordinance as unconstitutional on due process and equal protection grounds and it further dismissed Washington County's counterclaim. In the decree the chancellor made findings of fact, including the following:

> (16)    That the overwhelming testimony of the experts reflects that proximity to a water source is not a reliable basis for predicting whether a landfill may pollute nearby streams or rivers.
>
> (17)    That the experts convincingly established that rational and objective factors to consider in siting a landfill include geology of the land, degree of slope, directional flow of ground water, and the texture of the soil.
>
> (18)    That Washington County Ordinance No. 89-23 as adopted was not based upon rational and objective factors but rather upon negative attitudes and fears, community opposition and adverse public sentiment.
>
> (19)    That while genuinely wanting to protect water sources in Washington County, members of the Quorum Court arbitrarily and irrationally adopted Ordinance No.

89-23 to deny Sunray's request for specific geographic site approval and to halt its effort to site a landfill at the Durham Site.

(20)   That by enacting Ordinance No. 89-23 the Quorum Court has effectively blocked Sunray's application process without specifically naming any factors which inherently threaten the public health, welfare, safety and environment regardless of proper design and operation of the landfill.

(21)   That by enacting Ordinance No. 89-23, the Quorum Court has effectively denied all potential landfill operators and potential users of land for landfill purposes the right to pursue an application process without naming factors which inherently threaten the public health, welfare, safety and environment regardless of proper siting, design and operation of the landfill.

The decree also contained these conclusions of law:

(4)   That Washington County Ordinance No. 89-23 bears no rational relation to any legitimate governmental purpose and is therefore unconstitutional, illegal, invalid and unenforceable as a violation of due process of law. U.S. Const. Amend. XIV, Section 1; Ark. Const. Art. 2. (Citing case authority.)

(5)   That Washington County Ordinance No. 89-23 creates an unlawful classification against landfill operators and users of land for landfill purposes which bears no rational relation to any legitimate governmental purpose and is therefore unconstitutional, illegal, invalid and unenforceable as a violation of equal protection of law. U.S. Const. Amend. XIV, Section 1. (Citing case authority.)

In deciding this case we first consider the pollution threat involved. With landfills the threat of pollution of water sources is directly related to underground water flow. This is so because the potential exists for landfill refuse to mix with rain, seep underground, travel along the underground water course for some distance, and eventually pollute surface water sources. There was considerable expert testimony offered by Sunray at trial that surface conditions and distance bear little or no relationship to the

direction of underground water flow. Indeed, virtually all of the scientific testimony presented at trial supported Sunray's contentions. Mr. Witherspoon of Pollution Control testified that distance is not a valid criterion for a landfill site's suitability and that he could find no rational basis for imposing a two-mile buffer zone. Prohibiting landfills within two miles of surface water without proper study and adopted criteria and without empirical justification for doing so was arbitrary and irrational in his opinion. He admitted that distance might be a factor where geologic studies have been done and where "you have a good definition of the geologic structure."

Dr. White testified that a two-mile buffer zone provides no protection at all against landfill pollution of water sources. Underground geology controls, he testified; not distance from surface waters. He further stated that Northwest Arkansas does have a subsurface geology that could cause underground water to flow in any direction, including the opposite direction from where surface water is located. He knew of no rationale for requiring a minimum distance between landfills and surface water. Dr. White admitted that he had not done extensive field investigations in Northwest Arkansas.

A third expert called by Sunray was Jim Walsh, an engineer retained to work on the landfill site. He also testified that there was no rational explanation for prohibiting a landfill as far away as two miles from surface water. Any monitoring or control of contamination from the landfill should occur within 300 feet of the site, he stated. Otherwise, the contamination plume spreads out as it covers a greater distance and is impossible to contain. Walsh stated that there was no justification for a setback requirement beyond 300 feet. He was, however, aware of three states that had distance requirements of up to 1,000 feet.

The appellants countered this testimony with the live testimony of quorum court member and EAC chair, Lois Imhoff, and Beaver Water District engineer and director, Richard Starr. Lois Imhoff testified that two miles was a compromise and that some quorum court members had argued for five miles. She said that Richard Starr spoke in favor of the ordinance to protect the drinking water and recreation uses of Beaver Lake as did Dr. Richard Meyer, a University of Arkansas limnologist, who

studies lake qualities. She admitted that no analysis had been done on the effect the rivers named in the ordinance had on drinking water or recreation. Her testimony was followed by that of Richard Starr, who stated that he opposed all landfill sitings within the Beaver Lake watershed because of the impact on water quality. He testified that the ordinance did have a rational basis since distance offers some protection against pollution and provides an area to work in in the event of a leaking problem. He disagreed with the conclusion that controlling contamination could only effectively occur within 300 feet of the landfill.

In the evidentiary depositions of quorum court members and other appellants submitted by Sunray, some quorum court members alluded to public sentiment and common sense as justifications for the ordinance. Some members also admitted the direct correlation between adopting the ordinance and denying Sunray's request for site approval.

## I.

### *ARBITRARINESS*

The first question confronting this court is whether the ordinance is so lacking in any rational relationship to a government purpose so as to be arbitrary and constitute a due process violation. We think not. We have long subscribed to a lenient rational basis test in Arkansas. This test is best set forth in a 1983 tax case. *See Streight* v. *Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). There, we noted that the legislature is better equipped than the courts to investigate the arbitrariness of a certain tax exemption aimed at out-of-state retirees. We then said:

> Before it is said that such hypothesizing is far afield, we re-emphasize that our role is not to discover the *actual basis* for the legislation. Our task is merely to consider if *any* rational basis exists which demonstrates the possibility of a deliberate nexus with state objectives so that the legislation is not the product of utterly arbitrary and capricious government and void of any hint of deliberate and lawful purpose. Since we can reasonably conceive of lawful purposes for the state's classification scheme, it may not be held to have been arbitrarily enacted.

280 Ark. at 215, 655 S.W.2d at 464. Hence, any rationale that is a

lawful purpose will void a constitutional challenge for arbitrariness.

■ The Washington County quorum court was empowered to adopt landfill standards more restrictive than those of Pollution Control. *See* Ark. Code Ann. § 8-6-209 (Repl. 1991). By enacting a local zoning ordinance, the quorum court was exercising a legislative function, and the ordinance is subject to judicial scrutiny only to determine whether it is arbitrary, capricious, and unreasonable. *See Wenderoth* v. *City of Ft. Smith*, 251 Ark. 342, 472 S.W.2d 74 (1971). Absent arbitrariness or unreasonableness, the local ordinance should stand because the judiciary does not review the wisdom or rightness of legislation. *Id.*; *see also West Coast Hotel Co.* v. *Parrish*, 300 U.S. 379 (1937).

We believe a rational basis was embraced by the quorum court and supports this ordinance. Admittedly, no studies or analyses of the sub-surface geology had been made of the area in question by either party. And Sunray's case was replete with testimony that a) underground waterways may well not correspond to surface waterways due to sub-surface geology, and b) distance could work to impede the control of pollution emanating from the landfill. On the other hand Lois Imhoff testified that Dr. Richard Meyer and Richard Starr had told the quorum court that a buffer zone could provide protection and a safety area to correct leaking problems. Richard Starr confirmed that point of view to the chancellor in live testimony.

The goal of the quorum court was to protect water sources from landfill pollution — certainly a legitimate objective. It adopted an ordinance which endorsed a two-mile buffer zone as a means of doing this. We will not dismiss distance as a totally arbitrary reason for the ordinance when the record contains support for this position from the testimony of Richard Starr as well as other public comment, and when the quorum court members say they looked to common sense for additional support for their position. We are especially reluctant to give total credence to Sunray's experts when their testimony was premised to some extent on sub-surface geology, and no tests or analyses have been performed to ascertain the geology between Durham and the Middle Fork of the White River.

We also note that other jurisdictions have looked to distance

as a meaningful criterion for limiting landfill sitings. *See* Fla. Stat. Ann. § 403.707(5) (West Supp. 1990) (3,000 feet as the limiting distance); R.I. Gen. Laws § 23-18.9-9.1() (Reen. 1989) (total prohibition in watersheds for drinking water); RSA 483:4 (XVIII) (Supp. 1990) (1,320 feet from normal high water mark of designated natural rivers).

The chancery judge appears to some extent to have weighed the efficacy of competing methods for combating landfill pollution. In doing so, he looked to the fact that "overwhelming testimony" negated proximity to water as a reliable basis for predicting landfill pollution. The appropriate inquiry, however, was to ask whether a two-mile distance could have *any* bearing on landfill containment. For the ordinance to be arbitrary there must be a finding that it could have absolutely no bearing on the objective, and the testimony before the chancellor was conflicting on that point.

We, therefore, hold that the findings of the chancery judge pertaining to the arbitrariness of the ordinance and the absence of a legitimate rationale to sustain it to be clearly erroneous. We further hold that the chancellor erred as a matter of law in concluding that there was no rational relationship between the ordinance and pollution containment, since the quorum court members could have determined from the information before them that distance was a legitimate rationale for the ordinance.

## II.

### EQUAL PROTECTION

The chancery judge concludes in his Decree that the ordinance creates an unlawful classification against landfill owners and operators, but he does not define the favored class. Nor does Sunray in its complaint. The classification alleged could be between landfill owners within the buffer zone and other businesses in Washington County; or between landfill owners in the zone and landfill owners outside of the zone; or between landfill owners in the zone and other businesses in the zone. Our review is hampered by not knowing precisely what is the classification in question.

Clearly, Sunray and other similarly situated landfill owners in the buffer zone are singled out. Nevertheless, though a classification may exist in state law, any rational basis which demonstrates the possibility of a deliberate nexus with legitimate state objectives will save the ordinance. *Arkansas Hosp. Ass'n* v. *Arkansas State Board of Pharmacy*, 297 Ark. 454, 763 S.W.2d 73 (1989); *see also Cleburne* v. *Cleburne Living Center*, 473 U.S. 432 (1985). We have already held in this case that such a rational basis exists, and the U.S. Supreme Court has further held that the judiciary should not sit as a superlegislature to judge the wisdom or desirability of legislative policy in equal protection cases which do not affect fundamental rights and where regulation of local economic matters is involved. *See City of New Orleans* v. *Dukes*, 427 U.S. 297 (1976) (per curiam). We, accordingly, reverse the chancellor's conclusion that the ordinance establishes an arbitrary classification and violates the Equal Protection Clause.

## III.

### *PREEMPTION*

The chancellor acknowledged in his decree that the quorum court was authorized by state law to adopt more restrictive landfill standards than Pollution Control under Ark. Code Ann. § 8-6-209 (Repl. 1991). He went on to state that these standards must not conflict with any state law, but he did not find or conclude that such a conflict existed. In his memorandum opinion handed down the same date as his decree, he specifically says that if the ordinance had had a rational basis, it would not have been inconsistent with state or federal law.

The Solid Waste Management Act was passed by the Arkansas General Assembly in 1971. *See* Ark. Code Ann. § 8-6-201, *et seq.* (1987). During its last two regular sessions the General Assembly passed two comprehensive amendments to the Act. Act 870 of 1989 and Act 752 of 1991, now codified at Ark. Code Ann. § 8-6-201, *et seq.* (Repl. 1991 and Supp. 1991). The stated purpose in both Acts was to remedy disparities among the counties in their capacity to dispose of solid waste and in their ability to implement environmentally responsible operations. Both acts establish regional districts and create regional boards to adopt solid waste plans and to issue landfill permits.

Neither Act 870 nor Act 752 expressly repealed the counties' authority to adopt more stringent landfill standards under Ark. Code Ann. § 8-6-209 (Repl. 1991). And like the chancellor we do not find a repeal of § 8-6-209 due to a direct conflict with inconsistent provisions in the two new acts. On this point we have been resolute in holding that repeals of statutes by implication are not favored. *See City of Ft. Smith* v. *Driggers*, 294 Ark. 311, 742 S.W.2d 921 (1988); *Davis* v. *Cox*, 268 Ark. 78, 593 S.W.2d 180 (1980). Moreover, § 8-6-209 can be harmonized with the existing Solid Waste Management Act in that while regional boards are authorized to issue landfill permits under the Act, this does not preclude local governments from adopting additional landfill standards. In this same vein our County Government Code provides generally that it is consistent for the counties to promulgate more exacting standards of conduct than the state has adopted. *See* Ark. Code Ann. § 14-14-809(c) (1987).

Sunray also advances the argument that the state and federal governments have preempted the area of solid waste management, including the issuance of permits, and further argues that when Pollution Control authorized Sunray to commence the preapplication process, the quorum court could not impede this action by passing an ordinance and refusing to approve the Durham site. Sunray adduces much case authority from other jurisdictions in support of its preemption argument. But the authority cited does not embrace a situation, such as we have here, where a state statute specifically authorizes the counties to adopt more stringent landfill standards than the state. In sum, the power of the quorum court to act as it did in this case in passing the ordinance is expressly recognized under state law in § 8-6-209, and that section has not been repealed. We hold that neither the Arkansas Solid Waste Management Act nor the Resource Conservation and Recovery Act have preempted the authority of local governments to adopt additional landfill standards as provided for in this statute. *See* 42 U.S.C. § 6901, *et seq.* (1988); Ark. Code Ann. § 8-6-201, *et seq.* (Repl. 1991 and Supp. 1991).

## IV.

## DE NOVO REVIEW

■ We agree with Sunray that in an appeal from a chancery court decision all issues raised before the chancellor are before this court for review. *Ferguson* v. *Green*, 266 Ark. 556, 587 S.W.2d 18 (1979). However, we do not find merit in Sunray's *de novo* arguments.

■ a. *Vagueness*. Sunray contends that the ordinance is vague and overbroad in that it does not specify the factors that will determine "any other main water source," it does not define "civil penalties," and it does not state whether the two-mile buffer zone begins at the centerline of the river or the shoreline. The ordinance lists the primary water sources which vitiates this argument, while providing flexibility for the quorum court to expand on the list. There is also a legitimate flexibility in the civil penalties to be sought. Lastly, if it is the entire water source that is meant to be protected, common sense requires that the shoreline be the boundary of the buffer zone. Cf. *Connally* v. *General Construction Co.*, 269 U.S. 385 (1926).

■ b. *Separation of powers*. Sunray attacks the ordinance on grounds that the quorum court retains the power to approve civil litigation brought by the EAC officer, in conjunction with the county judge. This shared authority with the county executive does not constitute a usurpation of executive power such as occurred in *Chaffin* v. *Arkansas Game and Fish Commission*, 296 Ark. 431, 757 S.W.2d 950 (1988).

■ c. *Retrospective application*. The ordinance was not applied retrospectively, as Sunray argues, but used prospectively to deny the application. Undeniably, the ordinance's adoption and denial of the landfill application were closely related in the minds of some, if not all, quorum court members. But the ordinance was passed first and subsequently used as a means for dismissing the application.

■ d. *Impairment of contract*. No contract with Sunray was impaired by the adoption of the ordinance. The landfill site was purchased with full knowledge that it would not be operational without government approvals. Adoption of the ordinance was a facet of that approval process.

■ e. *Planning Board referral*. The Planning Board does have authority to prepare a zoning ordinance for the county. *See* Ark. Code Ann. § 14-17-209(a) (1987). But that is not exclusive authority which divests the quorum court of its power to adopt standards for the location of landfill sites. *See* Ark. Code Ann. § 8-6-209 (Repl. 1991).

■ f. *Exclusionary zoning*. Though Sunray contends that landfills, as a practical matter, are almost totally excluded throughout the county, this fact is disputed by the appellants. The chancellor made no finding on this point. Without a clear factual basis to sustain a holding of exclusionary zoning, we decline to so hold.

■ g. *Bill of attainder*. Sunray finally argues that the ordinance was a punishment directed specifically at its business and its landfill application in violation of the federal constitution and state law. *See* Ark. Code Ann. § 14-14-805(8) (1987). We disagree. While the Sunray application may have been the immediate catalyst for quorum court action, landfill standards were a source of on-going debate before the quorum court. The ordinance does not provide a specific penalty for Sunray or landfill owners in general. Followed to its logical end, Sunray's argument suggests that all regulations, zoning or otherwise, which affect landowners are acts of attainder. That is not the law.

Reversed.